IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs August 14, 2018

## JASON LYLES v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 22121     Stella L. Hargrove, Judge**

_____

### No. M2017-01786-CCA-R3-PC

_____

The petitioner, Jason Lyles, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. After our review of the record, briefs, and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Jason Dewitt Lyles.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Patrick Powell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Facts and Procedural History

In 2013, a Maury County jury convicted the petitioner of two counts of facilitating the sale of more than 0.5 grams of cocaine within a drug-free zone, Class C felonies (counts one and two); one count of selling more than 0.5 grams of cocaine within a drug-free zone, a Class B felony (count three); and one count of selling more than 0.5 grams of cocaine, a Class B felony (count four). The trial court sentenced him to concurrent terms of three years on count one, three years on count two, and eight years on count three, each at 100% release eligibility, as well as a consecutive sentence of ten years on count four, which was suspended to probation. The three-year sentences for counts one and

two were later amended to remove the drug-free zone enhancement. On direct appeal, this Court affirmed the petitioner's conviction and summarized the facts, as follows:

The State called Special Agent Forensic Scientist John Scott as its first witness, and the trial court accepted him as an expert in the field of forensic chemistry with a concentration in the identification of controlled substances. Special Agent Scott identified the two samples of "chunky powder" that were submitted to him as cocaine, a Schedule II controlled substance, and recorded their individual weights as 0.66 grams and 0.74 grams. Special Agent Forensic Scientist Jennifer Sullivan testified next and was also accepted by the trial court as an expert in the field of forensic science with a concentration in the identification of controlled substances. Special Agent Sullivan identified one sample of an unknown substance that was submitted to her as cocaine, a Schedule II controlled substance, and recorded the individual weight as 1.03 grams. Special Agent Forensic Scientist Glen Jay Glenn, who was also accepted by the trial court as an expert in the field of forensic science with a concentration in the identification of controlled substances, tested the fourth sample and identified it as cocaine, a Schedule II controlled substance, with a weight of 0.86 grams. The State established the chain of custody for the above evidence through the testimony of Columbia Police Department Officer Jeremy Humphrey.

The State called Kevin Odie[1] as its next witness. Mr. Odie had three felony drug charges pending at the time of trial and had three prior convictions for drug-related offenses, one of which resulted in an eleven-year prison sentence. For that reason, Mr. Odie sought out Officer Jason Dark with the Columbia Police Department and offered to assist him in undercover drug operations. Accordingly, Officer Dark asked Mr. Odie to "make a few buys," and Mr. Odie named individuals, including [the petitioner], from whom he believed he could purchase either marijuana or cocaine.

Mr. Odie testified that prior to June 15, 2012, he spoke with [the petitioner] about purchasing a gram of "powder" cocaine. A price was set, and a meet was scheduled. On that date, Mr. Odie met with Officer Dark to prepare for the buy. Officer Dark searched Mr. Odie's vehicle and his person and provided Mr. Odie with the money to purchase the drugs. Mr. Odie was also equipped with a surveillance device that captured both audio

---

[1] Mr. Odie is also referred to as Kevin Otey throughout the record.

and video of the transaction. He then drove to the home of [the petitioner's] sister to complete the transaction. When Mr. Odie drove up, [the petitioner] told him that the person from whom he had ordered the cocaine was going to bring it to Mr. Odie. The person delivering the drugs was allegedly traveling from Franklin to Columbia for the transaction. The surveillance showed the [petitioner] and Mr. Odie waiting for the person from Franklin to arrive.

Mr. Odie stated that while they waited, he and [the petitioner] drove to an address on Elaine Drive to attempt to purchase cocaine from someone there. Mr. Odie waited in his car while [the petitioner] walked up to a residence and returned with what he said was a gram of powder cocaine. [The petitioner] asked Mr. Odie what he intended to do with the cocaine, and Mr. Odie told him that he planned to sell it. Mr. Odie explained that he said that to [the petitioner] so that he would not have to share it with him. Mr. Odie and [the petitioner] then drove back to [the petitioner's] sister's residence.

Mr. Odie testified that after he left the residence, he contacted Officer Dark to let him know that the transaction had been completed. He met with the officer and relinquished the cocaine. Mr. Odie explained that the reason that [the petitioner] was not clearly pictured in the surveillance video during the time they drove to Elaine Drive was that he did not want it to appear obvious that he was wearing a recording device, which was placed on his left side. He explained that with the placement of the camera on his left side and with [the petitioner] in the passenger seat of the car, it was difficult to record [the petitioner] without "revealing" himself.

On June 20, 2012, Mr. Odie again met with Officer Dark to prepare for an undercover buy from [the petitioner]. Officer Dark followed the same procedures as before and attached the recording device to Mr. Odie in the same location. Mr. Odie stated that [the petitioner] gave him a price for the cocaine and instructed him to meet at [the petitioner's] mother's house, which was "[o]ut by Brown School." Because Mr. Odie was unfamiliar with the location, he telephoned [the petitioner] for directions while en route. After picking up [the petitioner] from his mother's location, Mr. Odie and [the petitioner] again drove to Elaine Drive, where [the petitioner] walked up to the residence as Mr. Odie remained in the vehicle. Mr. Odie can be heard on the audio tape instructing [the petitioner] to "not be in there all day" because it was hot outside. When the transaction was completed

and [the petitioner] returned to the vehicle with the cocaine, they drove to [the petitioner's] sister's residence.

Mr. Odie testified that on June 28, 2012, he and Officer Dark followed the same procedure and utilized the same recording device as in the previous transactions. This time, Mr. Odie picked up [the petitioner] from the dry cleaner where he was employed and drove him to his mother's residence. When Mr. Odie arrived at the dry cleaner, [the petitioner] had possession of the cocaine, and Mr. Odie paid him the agreed-upon price when they reached his mother's residence.

Mr. Odie stated that the last transaction in which he participated with [the petitioner] occurred on July 10, 2012. Following the same procedures, Mr. Odie planned to meet [the petitioner] at his sister's house, where the first transaction occurred. Officer Dark instructed Mr. Odie to attempt to obtain a better video image of [the petitioner] because the previous three videos did not clearly show [the petitioner's] face. When Mr. Odie arrived at the designated location, [the petitioner] walked out to Mr. Odie's car, and they conducted the transaction surreptitiously through the driver's side window of the vehicle. When it was complete, Mr. Odie left and met with Officer Dark.

Mr. Odie confirmed that following each transaction, he immediately met with Officer Dark and turned over the drugs and that he never tampered with or used any of the drugs himself. He also acknowledged that by helping Officer Dark, he hoped to avoid incarceration. Mr. Odie professed that he had changed his life and that he did not want to miss out on his "destiny" and time with his daughter. He also confessed that he was a former member of the Vice Lords gang but reiterated that he was no longer involved with them. He said that he had stopped selling drugs and that he no longer even socialized with gang members. Mr. Odie said that he assisted Officer Dark in obtaining over forty indictments for drug activity.

On cross-examination, defense counsel questioned Mr. Odie with respect to the lack of a clear video depiction of [the petitioner's] face during the first drug transaction. Mr. Odie explained that "if you move a certain way or anything like that, that person, if he's smart enough, . . . could tell . . . that object that you're using to record them." He stated that the recording device was in his watch, which he wore on his left hand, and that he could not "just flip this camera over like that[ ] to where they're going to see what's going on." With regard to the second transaction, Mr. Odie

explained that [the petitioner] suggested the meeting place near Brown School and that he merely followed [the petitioner's] instructions.

The State's next witness was Detective Jason Dark with the Columbia Police Department. Prior to becoming a detective in 2013, he was an investigator in the narcotics division. Detective Dark testified that it was common for the narcotics division to utilize confidential informants ("CI") who were trying to stay out of prison for their own drug charges. When a CI is involved in a drug operation, an officer would meet the CI and search him to be sure he did not have any drugs or money in his possession. The officer would also search the CI's vehicle. The officer would provide an electronic listening device to monitor the CI's safety and video and audio recording equipment, if possible. Before giving money to the CI to purchase drugs, the officer would photocopy the money. Detective Dark stated that he would give the CI a wristwatch containing the recording equipment and that he would allow the CI to choose where to place it. He would instruct the CI to act as "normal as possible."

Detective Dark said that when conducting a transaction, the officer in charge knew where the meet was supposed to occur but that it was not unusual for the meeting place to change during the operation. In fact, he characterized it as "normal" for the location to change during controlled buys. In this case, Detective Dark followed Mr. Odie as closely as possible without being "obvious." He explained that the listening device transmitted what was happening at the current time, whereas the recording device did not emit a signal that could be monitored. The listening device was used solely for the safety of the CI, and for that reason, Detective Dark needed to be close enough to hear everything and to be able to react if anything should go wrong.

Detective Dark clarified that although he was on Elaine Drive, he was not able to observe the first drug transaction. When Mr. Odie returned to the police department, Detective Dark recovered the cocaine and briefly interviewed Mr. Odie. Thereafter, he logged the cocaine into evidence. He confirmed that the evidence from the first transaction was the cocaine that weighed 0.66 grams per the TBI laboratory.

Detective Dark and Mr. Odie followed the same procedures for the three other drug transaction. The weight of the cocaine from the second transaction was 0.74 grams; from the third transaction, 1.03 grams; and from the fourth transaction, 0.86 grams.

Prior to the fourth transaction, Detective Dark emphasized to Mr. Odie the importance of capturing [the petitioner's] image on the recording device. He also explained that when analyzing a video for evidentiary purposes, he looked "beyond the obvious of the recording[ ] and start[ed] relying on mirrors, reflections, anything to help . . . tie in who's in that vehicle with your informant." While the first three videos contained glimpses of [the petitioner's] body or clothing, Mr. Odie was successful in capturing a clear image of [the petitioner's] face in the fourth video. Detective Dark explained that experienced sellers of drugs could exchange money for drugs very quickly and practically without notice.

Detective Dark confirmed that the transactions that occurred on Elaine Drive fell within a drug-free zone because it was within 1,000 feet of New Harvest Child Care Agency. The residence of [the petitioner's] mother was on Cord Drive, which was within 1,000 feet of a Columbia city park. The final transaction at [the petitioner's] sister's residence on Granada Drive did not fall within a drug-free zone.

Upon this evidence, the jury convicted [the petitioner] of the lesser-included offenses of facilitation of the sale of cocaine in a drug-free zone in counts one and two and convicted him as charged in counts three and four.

*State v. Jason Lyles*, No. M2013-02618-CCA-R3-CD, 2015 WL 3533719, *1-4 (Tenn. Crim. App. June 5, 2015).

After the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. In the petition, the petitioner alleged numerous claims of ineffective assistance of counsel. The petitioner subsequently hired counsel and filed an amended petition, alleging trial counsel was ineffective for failing to sever the petitioner's counts for trial. The post-conviction court held an evidentiary hearing during which trial counsel testified.

Trial counsel testified that he reviewed the videos from each of the drug sales. While he recognized he could have filed a motion to sever the four-count indictment for trial, he testified he made the strategic decision not to do so for two reasons: (1) he believed the motion would be unsuccessful based on his review of Tennessee law and (2) he believed trying all counts together enhanced his argument that the petitioner's actions amounted to no more than facilitation.

Concerning the legal basis for severance, trial counsel agreed there was no proof of a signature crime or common scheme or plan regarding the four transactions. In addition, there was no evidence Mr. Odie and the petitioner planned more than one transaction at a time. Trial counsel testified there was nothing about the petitioner that indicated he was a drug dealer. The petitioner worked full-time, lived with his long-time girlfriend and children, and did not have any drugs or drug paraphernalia in his home when he was arrested. Although he did not recall discussing the possibility of severance with the petitioner, trial counsel did emphasize the likelihood of conviction and his recommendation the petitioner accept a plea deal. However, the petitioner refused to accept a plea deal and chose to go to trial because he believed Mr. Odie would not testify against him.

When questioned about his trial strategy, trial counsel testified his strategy was to get all four counts down to facilitation. Trial counsel noted the first three videos did not show a transaction take place between the petitioner and Mr. Odie, but the fourth video showed both the petitioner and the transaction. As such, trial counsel agreed the evidence in support of count four was the strongest based on the videos. He acknowledged the weaknesses of counts one, two, and three would be more glaring without the video evidence supporting count four which bolstered the credibility of Mr. Odie. Trial counsel believed the jury could infer facilitation on all four counts "based on the facts and circumstances of the four counts as a whole." Trial counsel agreed severance would not have barred the use of a facilitation defense on any of the counts. However, the argument for facilitation on counts three and four would have been weakened because there was no proof anyone else delivered the drugs to the petitioner and he could not use the first two transactions to strengthen the argument.

Trial counsel told the petitioner he would likely be convicted of all counts if Mr. Odie testified and "did a good job articulating the facts." Trial counsel acknowledged Mr. Odie was a good witness and, if the jury found him credible, the petitioner could have been convicted on his testimony alone. According to trial counsel, the petitioner did not think Mr. Odie would testify against him because they were good friends and distant cousins. In addition, the petitioner was no longer involved in selling drugs and only helped Mr. Odie obtain the cocaine because Mr. Odie's grandmother had recently died and the petitioner felt sorry for him.

Finally, trial counsel testified the petitioner did not profit from any of the transactions with Mr. Odie, the petitioner was no longer actively selling drugs, and the petitioner wanted to help Mr. Odie because he felt bad for him. However, trial counsel did not want the petitioner to testify because it would open the door for him to be questioned concerning a prior drug conviction.

After its review of the evidence presented, the post-conviction court denied the petition. This timely appeal followed.

## *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for not filing a motion to sever the four-count indictment for trial. The State contends the post-conviction court properly denied the post-conviction petition because trial counsel's decision was strategic and based on informed preparation. Following our review of the record and submission of the parties, we agree with the State and affirm the judgment of the post-conviction court.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the petitioner argues trial counsel provided ineffective assistance of counsel by failing to file a motion to sever the petitioner's four-count indictment for trial. At the post-conviction hearing, trial counsel explained his strategy regarding the decision to keep the petitioner's counts joined, as follows:

> I thought that we had a good shot, especially on the two where he went to the third-party location of getting those down to facilitation, which we did. I remember thinking that if we had that proof in, that that allowed us the opportunity to argue to the jury that similar circumstances occurred on the two counts where [the petitioner] already had the drugs, just that the video didn't show him going to that third-party location earlier in the day and that perhaps we would get a verdict of facilitation on all counts.
>
> . . .
>
> [I] just tried to put -- I just tried to put the best theory and strategy together that I could to try the cases, and that's what we did.

Trial counsel testified he contemplated severing the four counts but decided against it after reviewing the issue and case law. He did not believe a motion to sever would be successful based on his studying of the applicable law. Therefore, he decided to center his defense strategy around obtaining facilitation verdicts on all counts. Trial counsel's strategic and tactical choices will not be second guessed when those choices are based on informed preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Simply because trial counsel's strategy was unsuccessful or even hurt the defense does not render the assistance ineffective. *Id.* The post-conviction court found trial counsel "fully attempted to put forward the best defense theory and strategy possible." We agree. The petitioner has failed to show by clear and convincing evidence how trial counsel's failure to file a motion to sever constituted ineffective assistance of counsel. *See Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgement of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE